UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — — — — — —   x

CRIMSON CAPITAL LLC and MICHAEL STAISIL,   :

                        Plaintiffs,   :

               v.   :   **08 Civ. 6554 (JFK)**

THE SPARTAN GROUP HOLDING COMPANY,   :
LLC, SPARTAN INVESTMENT PARTNERS LP,
SPARTAN INVESTMENT ASSOCIATES LP,   :   **ANSWER AND COUNTERCLAIMS**
SPARTAN PARTNERS GP, LLC, SPARTAN
CAPITAL MANAGEMENT, LLC, STEPHEN   :
NORRIS CAPITAL PARTNERS LLC, STEPHEN
NORRIS, M82 GROUP LLC, MARSHALL MANLEY, :
DDD VENTURES LLC, DENNIS DAMMERMAN,
GE ASSET MANAGEMENT INCORPORATED,   :
INFLEXION CAPITAL PARTNERS, LP, ABC LLC,
DEF LLC, UVW LP, and XYZ LP,   :

                       Defendants.   :

— — — — — — — — — — — — — — — — — — — — — — — — — — — —   x

     Defendants THE SPARTAN GROUP HOLDING COMPANY, LLC, SPARTAN

INVESTMENT PARTNERS LP, SPARTAN INVESTMENT ASSOCIATES LP, SPARTAN

PARTNERS GP, LLC, SPARTAN CAPITAL MANAGEMENT, LLC, M82 GROUP LLC,

MARSHALL MANLEY, DDD VENTURES LLC, and DENNIS DAMMERMAN,

("Defendants"), by their attorneys Bryan Cave LLP, as and for their Answer to the Complaint,

hereby allege upon information and belief as follows:

     1.       Deny the allegations set forth in paragraph "1" of the Complaint, and respectfully

refer the Court to the Limited Liability Company Agreement ("LLC Agreement"), a copy of which

is attached as Exhibit 1, for a full and accurate understanding of its terms and effect.

     2.       Deny the allegations set forth in paragraph "2" of the Complaint.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "3" of the Complaint.

4.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "4" of the Complaint.

5.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "5" of the Complaint.

6.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "6" of the Complaint.

7.      Admit the allegations set forth in paragraph "7" of the Complaint.

8.      Admit the allegations set forth in paragraph "8" of the Complaint.

9.      Deny the allegations set forth in paragraph "9" of the Complaint, except admit that Dammerman is a Florida resident, was chief executive officer and chairman of Kidder Peabody Group, Inc. for approximately six months beginning in 1994, and was chief financial officer of GE from 1984 to 1998, and Vice Chairman of GE and Chairman and CEO of GE Capital Services from 1998 to December 2005.

10.      Admit the allegations set forth in paragraph "10" of the Complaint.

11.      Admit that The Spartan Group Holding Company, LLC is incorporated in Delaware, but deny the remainder of Plaintiff's allegations set forth in the first sentence of paragraph "11" of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of paragraph "11" of the Complaint.  Deny the allegations set forth in the third sentence of paragraph "11" of the Complaint.

12.      Admit that Spartan Investment Partners, LP is a Delaware limited partnership, but deny the remainder of Plaintiff's allegations set forth in the first sentence of paragraph "12" of the Complaint.  Deny the allegations set forth in the second sentence of paragraph "12" of the

2

Complaint, and respectfully refer the Court to the LLC Agreement for a full and accurate understanding of its terms and effect.

13.    Admit that Spartan Investment Associates, LP is a Delaware limited partnership, but otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "13" of the Complaint.

14.    Admit that Spartan Partners GP is a Delaware limited liability company, but otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "14" of the Complaint.

15.    Admit that Spartan Capital Management, LLC is a Delaware limited liability company, but otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "15" of the Complaint.

16.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph "16" of the Complaint.  Deny the allegations set forth in the second sentence of paragraph "16" of the Complaint.

17.    Deny the allegations set forth in paragraph "17" of the Complaint.

18.    Deny the allegations set forth in paragraph "18" of the Complaint.

19.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "19" of the Complaint.

20.    Admit that discussions took place between Staisil, Norris, Manley, and Dammerman, but deny the remainder of Plaintiff's allegations set forth in paragraph "20" of the Complaint.

21.    Deny the allegations set forth in the first three sentence of paragraph "21" of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the fourth and fifth sentences of paragraph "21" of the Complaint.

0224526/1492788

22.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph "22" of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of paragraph "22" of the Complaint.  Deny the allegations set forth in the third sentence of paragraph "22" of the Complaint.  Deny the allegations set forth in the fourth sentence of paragraph "22" of the Complaint.

23.      Deny knowledge or information sufficient to form a belief as to the truth of the allegation that the Tiger Woods Foundation has billed Staisil for $120,000, and otherwise deny the allegations set forth in the third sentence of paragraph "23" of the Complaint, except admit that promotional materials at the event bore the name "Staisil Norris Partners."

24.      Deny the allegations set forth in paragraph "24" of the Complaint.

25.      Deny the allegations set forth in the paragraph "25" of the Complaint, except admit that The Spartan Group Holding Company was formed to operate as a co-investment fund.

26.      Deny the allegations of Paragraph "26" of the Complaint, and respectfully refer the Court to the LLC Agreement for a full and accurate understanding of its terms and effect.

27.      Deny the allegations of Paragraph "27" of the Complaint, and respectfully refer the Court to the LLC Agreement for a full and accurate understanding of its terms and effect.

28.      Deny the allegations of Paragraph "28" of the Complaint, and respectfully refer the Court to the LLC Agreement for a full and accurate understanding of its terms and effect.

29.      Deny the allegations of Paragraph "29" of the Complaint, and respectfully refer the Court to the LLC Agreement for a full and accurate understanding of its terms and effect.

30.      Deny the allegations of Paragraph "30" of the Complaint, except admit that Staisil agreed that he would bear his own costs, and respectfully refer the Court to the LLC Agreement for a full and accurate understanding of its terms and effect.

31.     Deny the allegations of Paragraph "31" of the Complaint, and respectfully refer the Court to the Confidential Private Placement Memorandum for a full and accurate understanding of its terms and effect.

32.     Deny the allegations of Paragraph "32" of the Complaint, except admit that Merrill Lynch agreed to act as a financial adviser.

33.     Deny the allegations of Paragraph "33" of the Complaint.

34.     Deny the allegations of Paragraph "34" of the Complaint, except admit that Norris sent an electronic message to Staisil on December 7, 2007, and respectfully refer the Court to that electronic message for a full and accurate understanding of its terms and effect.

35.     Deny the allegations of Paragraph "35" of the Complaint, and respectfully refer the Court to that electronic message for a full and accurate understanding of its terms and effect.

36.     Deny the allegations of Paragraph "36" of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the fourth sentence of paragraph "36" of the Complaint.

37.     Deny the allegations set forth in paragraph "37" of the Complaint.

38.     Defendants repeat and reiterate each and every response in paragraphs 1 through 37 of its Answer with the same force and effect.

39.     Deny the allegations set forth in paragraph "39" of the Complaint.

40.     Deny the allegations set forth in paragraph "40" of the Complaint.

41.     Defendants repeat and reiterate each and every response in paragraphs 1 through 40 of its Answer with the same force and effect.

42.     Deny the allegations set forth in paragraph "42" of the Complaint.

43.     Deny the allegations set forth in paragraph "43" of the Complaint.

44.    Defendants repeat and reiterate each and every response in paragraphs 1 through 43 of its Answer with the same force and effect.

45.    Deny the allegations set forth in paragraph "45" of the Complaint.

46.    Deny the allegations set forth in paragraph "46" of the Complaint.

47.    Defendants repeat and reiterate each and every response in paragraphs 1 through 46 of its Answer with the same force and effect.

48.    Deny the allegations set forth in paragraph "48" of the Complaint.

49.    Deny the allegations set forth in paragraph "49" of the Complaint.

50.    Defendants repeat and reiterate each and every response in paragraphs 1 through 49 of its Answer with the same force and effect.

51.    Deny the allegations set forth in paragraph "51" of the Complaint.

52.    Deny the allegations set forth in paragraph "52" of the Complaint.

53.    Defendants repeat and reiterate each and every response in paragraphs 1 through 52 of its Answer with the same force and effect.

54.    Deny the allegations set forth in paragraph "54" of the Complaint.

55.    Deny the allegations set forth in paragraph "55" of the Complaint.

56.    Defendants repeat and reiterate each and every response in paragraphs 1 through 55 of its Answer with the same force and effect.

57.    Deny the allegations set forth in paragraph "57" of the Complaint.

58.    Deny the allegations set forth in paragraph "58" of the Complaint.

0224526/1492788

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

59.     The Complaint fails to state a claim against the Defendants for which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

60.     The Complaint should be dismissed for lack of personal jurisdiction.

### THIRD AFFIRMATIVE DEFENSE

61.     Any recovery or relief to which Plaintiffs may have been entitled (if any) is barred, in whole or in part, under the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

62.     Plaintiffs' prior breaches of and/or misrepresentations made in connection with any alleged or underlying agreements with Defendants excused any conduct by Defendants and/or bars any recovery or relief to which Plaintiffs may have been entitled (if any), in whole or in part.

### FIFTH AFFIRMATIVE DEFENSE

63.     Defendants M82 Group LLC and DDD Ventures at all times acted properly, with due care and good faith, and in accordance with their obligations under the LLC Agreement, as concerns the matters at issue in this action.

### SIXTH AFFIRMATIVE DEFENSE

64.     Pursuant to Section 12.4(a) of the LLC Agreement, Defendants Marshall Manley, M82 Group LLC, Dennis Dammerman, and DDD Ventures have no liability except for their own willful misconduct.

## SEVENTH AFFIRMATIVE DEFENSE

65.        Pursuant to Section 12.4(b) of the LLC Agreement, Defendants Marshall Manley, M82 Group LLC, Dennis Dammerman, and DDD Ventures have no obligation for any debts, obligations, or liabilities of Spartan Holdings.

## EIGHTH AFFIRMATIVE DEFENSE

66.        Section 13.3 of the Limited Liability Agreement, which provides that the "Agreement and the Certificate of Formation replace and supersede all prior written agreements and oral statements by and among the Members or any of them, and no agreements and oral statements by and among the Members or any of them, and no representation, statement, condition or warranty not contained in this Agreement or the Certificate of Formation will be binding on the Members or have any force or effect whatsoever," precludes Plaintiffs from recovering for any damages suffered as a result of any alleged prior written agreements or oral statements made before the signing of the LLC Agreement.

## NINTH AFFIRMATIVE DEFENSE

67.        Plaintiffs' recovery pursuant to the Complaint, and each purported cause of action alleged therein, is barred in whole or in part by the "business judgment rule,"  and/or otherwise because any acts and/or omissions by Defendants with respect to the matters alleged in the Complaint were undertaken (or not undertaken, as the case may be) in good faith based on the best interests of Spartan Holdings as such best interests were reasonably understood by Defendants.

## TENTH AFFIRMATIVE DEFENSE

68.        If Plaintiffs have suffered any loss, it is as a result (in whole or in part) of their own culpable conduct.

## ELEVENTH AFFIRMATIVE DEFENSE

69.      If Plaintiffs have suffered any loss, they must bear that proportion of the total loss as was caused by their own culpable conduct.

## TWELFTH AFFIRMATIVE DEFENSE

70.      Defendants' alleged conduct was not the proximate cause of Plaintiffs' alleged damages.

## THIRTEENTH AFFIRMATIVE DEFENSE

71.      Plaintiffs' recovery pursuant to the Complaint, and each purported cause of action alleged therein, is barred in whole or in part because Plaintiffs' have engaged in fraud.

## FOURTEENTH AFFIRMATIVE DEFENSE

72.      Spartan Investment Partners LP, Spartan Investment Associates LP, Spartan Partners GP, LLC, Spartan Capital Management, LLC are not proper party defendants, as they had no knowledge of or acquiescence in, and did not ratify or participate in, any of the acts or omissions upon which Plaintiffs' claims allegedly are based, and are not directly and separately liable for any such acts or omissions of the other Defendants during the relevant time period.

## FIFTEENTH AFFIRMATIVE DEFENSE

73.      At no time did Manley and Dammerman individually enter into the LLC Agreement or any other agreement with Plaintiffs.  Accordingly, Manley and Dammerman cannot be held liable to Plaintiffs for any alleged liability arising out of the LLC Agreement, and the Complaint must be dismissed as against them.

## SIXTEENTH AFFIRMATIVE DEFENSE

74.      Plaintiff has an adequate remedy at law for damages against the Defendants.

0224526/1492788

## COUNTERCLAIMS

Defendants Marshall Manley, M82 Group LLC, Dennis Dammerman, and DDD Ventures, as and for their counterclaims against Plaintiffs allege as follows:

### Parties

75.     Counterclaim-Plaintiff Marshall Manley is an individual residing in the State of Florida.

76.     Counterclaim-Plaintiff Dennis Dammerman is an individual residing in the State of Florida.

77.     Counterclaim-Plaintiff M82 Group LLC is a Florida limited liability company with its principal place of business located at 2475 Marseilles Dr., Palm Beach Gardens, FL 33410.

78.     Counterclaim-Plaintiff DDD Ventures LLC is a Delaware limited liability company with its principal place of business located at 2954 Hurlingham Drive, Wellington, FL 33414.

### Background

79.     In the spring of 2007, defendant Norris and plaintiff Staisil represented to defendants Manley and Dammerman that they were partners in an entity called Staisil Norris Partners and engaged in discussions with Manley and Dammerman about starting a co-investment fund which would invest side-by-side with other investors.

80.     Upon information and belief, Manley and Dammerman were approached because of their contacts with potential investors for a co-investment fund, business knowledge, background, experience, and reputation, among other things.

81.     Plaintiff Staisil represented to Defendants that, among other things, he was a highly liquid New York based investment banker, someone who had his own Gulfstream airplane, that he had $50 million available for a co-investment fund, and that he would bring a combination of Fortress and XE Capital as potential anchoring investors to a potential co-investment fund.

10

82.     Defendants Manley and Dammerman were also told that Staisil would contribute $5 million as initial capital for the potential co-investment fund.

83.     In or around May 2007, and in reliance on Staisil's representations, defendants Manley and Dammerman agreed to form a co-investment fund in which Dammerman, Manley, and Norris were each to receive a salary of $700,000 per year, and an expense account of $60,000 per month.

84.     Defendants, in reliance on the promises and representations of Plaintiffs, entered into the LLC Agreement on or about July 25, 2007.

85.     As it turned out, Staisil's representations were false.  He did not raise or contribute any working capital, nor did he spend material time on activities related to Spartan Holdings.

86.     Defendants Marshall Manley, M82 Group LLC, Dennis Dammerman, and DDD Ventures LLC spent substantial time, effort, and money to pursue the Spartan co-investment fund (the "Co-Investment Fund").

87.     Despite months of effort and outreach to scores of potential investors, Spartan has been unable to secure commitments from more than one investor, which limited its participation to a maximum of five percent of the Co-Investment Fund.

88.     As a result, Spartan's efforts are being wound down.

### FIRST COUNTERCLAIM

### (BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING)

89.     Repeat and reallege each of the allegations contained in Paragraphs 1 through 88 as if fully contained herein.

90.     As a managing member of Spartan Holdings and the principal of a managing member, Plaintiffs owe fiduciary duties to the Defendants Marshall Manley, M82 Group LLC,

Dennis Dammerman, and DDD Ventures, and in the case of Plaintiff Staisil, are duty-bound not to cause Plaintiff Crimson not to breach its fiduciary duties or knowingly participate in those breaches.

91.      In violation of said duty, among other wrongful acts, Plaintiffs did not raise or contribute any working capital, nor did they spend material time on activities related to Spartan Holdings.

92.      By reason of the foregoing, said Defendants have been damaged in the amount to be determined at trial but at least $100,000.00 and in such further amounts as may be proven at trial.

## SECOND COUNTERCLAIM

### (EQUITABLE ESTOPPEL)

93.      Repeat and reallege each of the allegations contained in Paragraphs 1 through 92 as if fully contained herein.

94.      Defendants Marshall Manley, M82 Group LLC, Dennis Dammerman, and DDD Ventures reasonably relied to their detriment on the misleading statements, omissions, and actions of Plaintiffs that led them to spend substantial time, effort, and money to pursue the Spartan Co-Investment Fund.

95.      By reason of the foregoing, said Defendants have been damaged in the amount to be determined at trial but at least $100,000.00 and in such further amounts as may be proven at trial.

## THIRD COUNTERCLAIM

### (FRAUD)

96.      Repeat and reallege each of the allegations contained in Paragraphs 1 through 95 as if fully contained herein.

97.        As discussed above, Defendants relied to their detriment on the misleading statements, omissions, and actions of Plaintiffs that led them to spend substantial time, effort, and money to pursue the Spartan Co-Investment Fund.

98.        Upon information and belief, Plaintiffs knew that these representations were false and their actions were misleading and made such representations and took such actions fraudulently to induce Defendants to enter into the LLC Agreement.

99.        Defendants reasonably relied on Plaintiffs' misleading actions and representations in deciding to enter into the LLC Agreement.

100.        By reason of the foregoing, said Defendants have been damaged in the amount in the amount to be determined at trial but at least $100,000.00 and in such further amounts as may be proven at trial.

## FOURTH COUNTERCLAIM

## (IN THE ALTERNATIVE – BREACH OF CONTRACT)

101.        Repeat and reallege each of the allegations contained in Paragraphs 1 through 100 as if fully contained herein.

102.        In the event that this Court determines that the merger clause contained in Section 13.3 of the Limited Liability Agreement is not valid, Defendants Manley and Dammerman are owed salary of $700,000 per year, plus an expense account of $60,000 per month pursuant to an agreement with Plaintiffs.

103.        By reason of the foregoing, said Defendants have been damaged in the amount to be determined at trial but at least $1,400,000.00 and in such further amounts as may be proven at trial.

**WHEREFORE,** Defendants demand judgment: (i) dismissing the Complaint in its entirety; (ii) awarding to Defendants the costs and disbursements of this action; (iii) awarding Defendants the relief requested in their First Counterclaim; (iv) awarding Defendants the relief requested in their Second Counterclaim; (v) awarding Defendants the relief requested in their Third Counterclaim; (vi) awarding Defendants the relief requested in their Fourth Counterclaim; and (vii) granting such other relief as this Court deems just and proper.

Dated: July 25, 2008
     New York, New York

BRYAN CAVE LLP

By:     /s/ William J. Hibsher
     William J. Hibsher
     John D. Kircher
     1290 Avenue of the Americas
     New York, New York 10104
     (212) 541-2000
     *Attorneys for Defendants The Spartan Group Holding Company, LLC, Spartan Investment Partners LP, Spartan Investment Associates LP, Spartan Partners GP, LLC, Spartan Capital Management, LLC, M82 Group LLC, Marshall Manley, DDD Ventures LLC, and Dennis Dammerman*

0224526/1492788

*Proskauer Rose Draft*
*7/24/2007*

# THE SPARTAN GROUP HOLDING COMPANY LLC

## LIMITED LIABILITY COMPANY AGREEMENT

by and among

CRIMSON CAPITAL LLC,

STEPHEN NORRIS CAPITAL PARTNERS LLC,

M82 GROUP LLC

and

DDD VENTURES LLC

Dated as of July ***[25]***, 2007

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS........................................................................................1

Section 1.1    Certain Definitions...............................................................................1
Section 1.2    Additional Definitions .........................................................................7

ARTICLE II     FORMATION; PURPOSE .....................................................................7

Section 2.1    Formation of Limited Liability Company..............................................7
Section 2.2    Purpose.................................................................................................8
Section 2.3    Term.....................................................................................................8
Section 2.4    Registered Agent and Office.................................................................8
Section 2.5    Principal Place of Business...................................................................8
Section 2.6    Fiscal Year ...........................................................................................8

ARTICLE III    MEMBERS; CAPITAL CONTRIBUTIONS AND LOANS BY
               MEMBERS .............................................................................................8

Section 3.1    Names, Addresses and Capital Commitments of Members.....................8
Section 3.2    Initial Capital Contributions ................................................................9
Section 3.3    Capital Calls.........................................................................................9
Section 3.4    Additional Capital Contributions..........................................................9
Section 3.5    Withdrawal............................................................................................9
Section 3.6    Loans by Members................................................................................10
Section 3.7    Limitation on Liability; Activities ........................................................10
Section 3.8    Partition................................................................................................10
Section 3.9    Capital Accounts...................................................................................10
Section 3.10   Carried Interest Payments.....................................................................11
Section 3.11   Death or Disability................................................................................11
Section 3.12   Duties ...................................................................................................11

ARTICLE IV     MANAGEMENT AND CONTROL OF THE COMPANY .........................12

Section 4.1    Management by Directors.......................................................................12
Section 4.2    Number, Tenure and Qualification; Directors. .......................................13
Section 4.3    Quorum and Manner of Acting...............................................................14
Section 4.4    Place of Meetings..................................................................................14
Section 4.5    Annual and Regular Meetings ...............................................................14
Section 4.6    Special Meetings...................................................................................14
Section 4.7    Notice of Meetings; Waiver of Notice....................................................14
Section 4.8    Board Action Without a Meeting............................................................15
Section 4.9    Participation in Board Meetings by Conference Telephone......................15
Section 4.10   Resignation and Removal of Directors ..................................................15
Section 4.11   Vacancies .............................................................................................15
Section 4.12   Compensation .......................................................................................15

i

Page

ARTICLE V        MEETINGS OF MEMBERS ....................................................................... 15

Section 5.1      Special Meetings ......................................................................... 15
Section 5.2      Place and Time of Meetings ........................................................ 15
Section 5.3      Notice of Meetings; Waiver of Notice .......................................... 16
Section 5.4      Quorum ....................................................................................... 16
Section 5.5      Voting; Proxies ........................................................................... 16
Section 5.6      Action by Consent Without a Meeting .......................................... 17

ARTICLE VI       OFFICERS ............................................................................................. 17

Section 6.1      Executive Officers; Security ......................................................... 17
Section 6.2      Election; Term of Office ............................................................... 17
Section 6.3      Subordinate Officers .................................................................... 17
Section 6.4      Removal and Resignation of Officers ........................................... 17
Section 6.5      Vacancies .................................................................................... 17
Section 6.6      Chief Executive Officer ............................................................... 18
Section 6.7      President ...................................................................................... 18
Section 6.8      Chairman ..................................................................................... 18
Section 6.9      Vice President .............................................................................. 18
Section 6.10     Treasurer ..................................................................................... 18
Section 6.11     Secretary and Assistant Secretaries ............................................. 18
Section 6.12     Salaries ....................................................................................... 18
Section 6.13     Voting of Shares in Corporations ................................................. 18

ARTICLE VII      ACCOUNTING AND RECORDS ............................................................. 19

Section 7.1      Records and Accounting ............................................................... 19
Section 7.2      Access to Accounting Records ..................................................... 19
Section 7.3      Tax Returns ................................................................................. 19
Section 7.4      Accounting Decisions ................................................................... 19
Section 7.5      Treatment as Partnership .............................................................. 19
Section 7.6      Section 754 Election ..................................................................... 19
Section 7.7      Tax Matters Partner ...................................................................... 19
Section 7.8      Other Records .............................................................................. 20

ARTICLE VIII     DISTRIBUTIONS ................................................................................... 20

Section 8.1      General Principles; Amount and Priority. ...................................... 20
Section 8.2      Tax Distributions. ........................................................................ 21
Section 8.3      Limitation Upon Distributions. ..................................................... 21

ARTICLE IX       TAXATION PROVISIONS ...................................................................... 22

Section 9.1      Allocation of Net Profits and Net Losses of the Company. .............. 22
Section 9.2      Residual Allocations ..................................................................... 22
Section 9.3      Special Allocations. ..................................................................... 22

ii

| | | |
|---|---|---|
| Section 9.4 | Regulatory Provisions | 23 |
| Section 9.5 | Section 704(c) Allocation | 24 |
| Section 9.6 | Withholding | 24 |
| Section 9.7 | Distributions in Kind | 24 |
| ARTICLE X | TRANSFERABILITY | 24 |
| Section 10.1 | Restrictions on Transfer. | 24 |
| Section 10.2 | Effectiveness of Transfers | 25 |
| Section 10.3 | Joinder | 25 |
| ARTICLE XI | TERMINATION | 25 |
| Section 11.1 | Termination of the Company. | 25 |
| Section 11.2 | Individual Termination | 26 |
| Section 11.3 | Distribution of Assets. | 26 |
| Section 11.4 | Certificate of Cancellation | 26 |
| Section 11.5 | Return of Contribution Nonrecourse to Other Members | 26 |
| ARTICLE XII | INDEMNIFICATION AND LIMITED LIABILITY | 26 |
| Section 12.1 | Indemnification of Officers and Directors | 26 |
| Section 12.2 | Indemnification of Employees | 27 |
| Section 12.3 | Advance Payment | 27 |
| Section 12.4 | Limited Liability. | 27 |
| ARTICLE XIII | MISCELLANEOUS | 28 |
| Section 13.1 | Representations and Warranties of the Members | 28 |
| Section 13.2 | Remedies. | 28 |
| Section 13.3 | Entire Agreement; Amendment. | 29 |
| Section 13.4 | Severability | 29 |
| Section 13.5 | Legal Representation | 30 |
| Section 13.6 | Notices | 30 |
| Section 13.7 | Binding Effect; Assignment. | 30 |
| Section 13.8 | Recapitalizations, Exchanges, etc. | 30 |
| Section 13.9 | Action Necessary to Effectuate the Agreement | 31 |
| Section 13.10 | Purchase for Investment. | 31 |
| Section 13.11 | Title to Property | 31 |
| Section 13.12 | Creditors. | 31 |
| Section 13.13 | Reliance on Authority of Persons Signing Agreement | 31 |
| Section 13.14 | No Waiver. | 31 |
| Section 13.15 | Counterparts. | 31 |
| Section 13.16 | Headings, etc. | 32 |
| Section 13.17 | Governing Law; Jurisdiction; Service of Process | 32 |
| Section 13.18 | Confidentiality; Public Announcements | 32 |

## LIMITED LIABILITY COMPANY AGREEMENT OF
## THE SPARTAN GROUP HOLDING COMPANY LLC

This **LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") is entered into as of July ***[     ]***, 2007 by and among CRIMSON CAPITAL LLC, a Nevada limited liability company (together with its successors and permitted assigns, "Crimson"), STEPHEN NORRIS CAPITAL PARTNERS LLC, a Delaware limited liability company (together with its successors and permitted assigns, "SN Capital"), M82 GROUP LLC, a Florida limited liability company (together with its successors and permitted assigns, "M82") and DDD VENTURES LLC, a Delaware limited liability company (together with its successors and permitted assigns, "DDD" and, together with Crimson, SN Capital and M82, the "Initial Members") in respect of THE SPARTAN GROUP HOLDING COMPANY LLC (the "Company"), a Delaware limited liability company.

**WHEREAS**, a certificate of formation of the Company was filed with the office of the Secretary of State of the State of Delaware on April 12, 2007 (the "Certificate of Formation"), thereby forming the Company as a limited liability company pursuant to the provisions of the Delaware Act (as defined below);

**WHEREAS**, the Members wish to adopt this Agreement as the limited liability company agreement of the Company and to operate the Company in accordance with terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    **Certain Definitions.**  For the purposes of this Agreement, the following terms shall have the following meanings:

"Adjusted Capital Account" means, with respect to any Member, the balance in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (a) increase such Capital Account by any amounts which such Member is obligated to contribute to the Company (pursuant to the terms of this Agreement or otherwise) or is deemed to be obligated to contribute to the Company pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5) as of the end of the Company's Fiscal Year or other applicable period; and (b) reduce such Capital Account by the amount of the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

An "Affiliate" of a specified Person means a Person who, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person and, when used with respect to the Company or any of its Subsidiaries, shall include any holder of equity interests representing greater than ten percent (10%) of the total number of outstanding equity interests of the Company or any of its Subsidiaries on a fully-diluted basis or any officer or director of the Company or any of its Subsidiaries.

1.

"Agreement" means this limited liability company agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

"Available Cash Flow" means, with respect to any Fiscal Year or other period, the sum of all cash receipts of the Company from any and all sources, less all cash disbursements (including loan repayments, capital improvements and replacements) and a reasonable allowance for reserves, contingencies and anticipated obligations as determined by the Board of Directors.

"Capital Account" means, with respect to each Member, an account determined in accordance with the provisions of Section 3.8.

"Capital Commitment" of a Member means the amount set forth under the heading "Capital Commitment" opposite the name of such Member on Schedule A, as it may be amended from time to time pursuant to this Agreement.

"Capital Contribution" means the total value of cash and agreed gross fair market value of property contributed to the Company by each Member pursuant to Section 3.1, 3.2, 3.3 and 3.4 (but only to the extent provided therein) as of the date in question.

"Change of Control" means, with respect to each Member, the occurrence of either of the following events: (a) the failure of such Member's Key Person to, directly or indirectly, Control such Member or (b) the failure of such Member's Key Person and/or his immediate family members (or trusts established for the benefit of such immediate family members) to own, directly or indirectly, at least 75% of each class of equity interests of such Member.

"Code" means the Internal Revenue Code of 1986, as amended.

"Control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power (i) to vote a majority of the outstanding voting securities of such person or entity; or (ii) to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as the same may be amended from time to time.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

"Director" means a natural person elected or appointed to the Board of Directors pursuant to the provisions of this Agreement. A Director shall be a manager of the Company for purposes

2

of the Delaware Act, but, notwithstanding the foregoing, no Director shall have any rights or powers beyond the rights and powers granted to such Director in this Agreement.

"Disability" has the meaning set forth in the definition of "For Cause Event."

"Distribution" means, with respect to any Member, the amount of cash and the fair market value of any property (other than cash) distributed by the Company to such Member under Section 8.1 hereof.

"Employee Benefits" means benefits in accordance with the terms of the Company's or the applicable Subsidiary's employee benefits plans form time to time, health insurance and short term and long term disability insurance, retirement and fringe benefits.

"For Cause Event" means, with respect to any Member:

    (a)    the Key Person of such Member willfully and intentionally failing or refusing to be actively involved in accomplishing the Company's purpose, for reasons other than illness or incapacity, which failure or refusal is not cured within fifteen (15) days following notice from the Company describing such failure or refusal; provided, however, if such failure or refusal is not corrected within such fifteen (15) day period and such Member's Key Person is diligently proceeding to cure such default, the fifteen (15) day period shall be extended to forty-five (45) days;

    (b)    such Member's or the Key Person of such Member's gross negligence;

    (c)    such Member has committed a Member Default;

    (d)    any willful and intentional act of such Member or such Member's Key Person involving malfeasance, fraud, theft, misappropriation of funds, embezzlement or dishonesty affecting the Company;

    (e)    such Member's Key Person's conviction or plea of guilty or nolo contendere to, an offense which is a felony in the jurisdiction involved;

    (f)    a Change of Control of such Member;

    (g)    the death of such Member's Key Person;

    (h)    if such Member's Key Person becomes physically or mentally incapacitated and is therefore unable for a period of six (6) consecutive months or for an aggregate of nine (9) months in any twenty-four (24) consecutive month period to be actively involved in the Company's business and achieving its business purposes (such incapacity being hereinafter referred to as "Disability");

    (i)    such Member, such Member's Key Person or their respective Affiliates are actively involved in, or have a direct or indirect financial interest (which for this purpose shall include a carried interest) as a general partner, sponsor, employee or the equivalent, in any

3

pooled investment vehicle that has investment objectives substantially similar to those of the Fund.

The Board of Directors shall, in good faith, determine if a "For Cause Event" has occurred with respect to any Member.

"Fund" shall mean Spartan Co-Investment Partners, L.P., a Delaware limited partnership formed for the purpose of investing side-by-side with qualified private equity and strategic investors in connection with private investments in a broad spectrum of industries (the "Initial Fund") and any successor pooled investment vehicle having investment objectives substantially the same as the Initial Fund.

"GAAP" means the generally accepted accounting principles in the United States of America, as such principles are changed from time to time, consistent with those applied in the preparation of the financial statements of such Person.

"Gross Asset Value" means, with respect to any asset of the Company, the Company's adjusted basis for federal income tax purposes; provided, however, that (a) the Gross Asset Value of any asset contributed by a Member to the Company as a Capital Contribution or distributed to a Member by the Company shall be the gross fair market value of such asset (computed without taking into account Code Section 7701(g)) as reasonably determined by the Board of Directors as of the date of the contribution or distribution, as the case may be; (b) the Gross Asset Value of all assets of the Company shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Board of Directors, upon the liquidation of the Company for federal income tax purposes (including a deemed liquidation) pursuant to Code Section 708(b)(1)(B)); (c) the Gross Asset Value of all assets of the Company shall be adjusted to equal their respective gross fair market values (taking into account Code Section 7701(g)), as reasonably determined by the Board of Directors, as of (i) the date of the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution to the Company, (ii) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to, or for the benefit of the Company, or (iii) upon the distribution by the Company to a retiring or continuing Member of more than a de minimis amount of property or money. At all times, Gross Asset Values shall be adjusted by Depreciation taken into account with respect to the Company's assets for purposes of computing Net Profits and Net Losses.

"Initial Fund" has the meaning set forth in the definition of Fund.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit A attached hereto.

"Key Person" means (i) with respect to Crimson, Michael Staisil, (ii) with respect to SN Capital, Stephen Norris, (iii) with respect to M82, Marshall Manley, (iv) with respect to DDD, Dennis Dammerman and (v) with respect to any other Member, such individual or individuals designated by the Board of Directors.

"Lien" means any lien, mortgage, pledge, security interest, adverse claim (as defined in the New York Uniform Commercial Code) or other type of charge or encumbrance of any kind,

4

or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property and any financing statement filed in respect of any of the foregoing.

"Major Decision" means any of the following actions relating to the Company or any Subsidiary:

(a)    make any loans to, or enter into any transaction or arrangement with, a Member or its Affiliates;

(b)    subject to Section 13.3(d), amend this Agreement, except pursuant to Section 13.3(b) or Section 13.3(c);

(c)    do any act in contravention of this Agreement;

(d)    admit any additional Member into the Company or otherwise issue any equity interest in the Company or any Subsidiary;

(e)    cause the Company or any Subsidiary to undertake a merger, consolidation or other form of reorganization;

(f)    cause the Company to make any distribution of Company property in kind to any Member;

(g)    change the nature of the business conducted by the Company or its purposes as described in Section 2.2;

(h)    confess to any judgment (but not including settlements) against the Company or any Subsidiary;

(i)    extend the term of the Company;

(j)    file a bankruptcy petition on behalf of the Company or any Subsidiary; or

(k)    determine that a "For Cause Event" has occurred with respect to any Member.

"Member" shall mean each of the Initial Members and any Person who is admitted as a Member of the Company in accordance with the terms of this Agreement and applicable law.

"Membership Interest" shall mean a Member's interest in the Company, including such Member's right to profits, losses and distributions, and the right, if any, to participate in the management of the business and affairs of the Company, in each case to the extent granted pursuant to the terms of this Agreement, together with the obligation to comply with the terms of this Agreement.

"Net Profits" and "Net Losses" mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required

5

to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments: (a) any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be added to such taxable income or loss; (b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses shall be subtracted from such taxable income or loss; (c) in lieu of depreciation, amortization or other cost recovery deductions, there shall be taken into account Depreciation in computing such taxable income or loss; and (d) gain or loss resulting from the disposition of property shall be computed by reference to the Gross Asset Value of the property, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

"Officer" or "Officers" means the officers of the Company set forth in Section 6.1.

"Percentage Interest" means, with respect to each member, the percentage set forth opposite its name on Schedule A under the column "Percentage Interest", as such percentage may be adjusted from time to time pursuant to this Agreement; provided, however, in the event a Member becomes the subject of a For Cause Event, (i) the Percentage Interest of such Member shall be reduced by fifty percent (50%) and (ii) the Percentage Interest of the remaining Members who were not previously the subject of a For Cause Event shall be increased by allocating the reduction in the Percentage Interest referenced in clause (i) among such remaining Members in proportion to their respective Percentage Interests (immediately prior to making the adjustment referenced in this proviso).

"Person" means an individual, corporation, partnership, limited liability company, trust, unincorporated association, government or any agency or political subdivision thereof, or any other entity.

"SEC" means the Securities and Exchange Commission or successor agency or commission of the United States federal government.

"Subsidiary" with respect to any Person (the "Parent") means any Person of which such Parent, at the time in respect of which such term is used, (a) owns directly or indirectly more than 50% of the equity or beneficial interest, on a consolidated basis, or (b) owns directly or controls with power to vote, indirectly through one or more Subsidiaries, shares of capital stock or beneficial interest having the power to cast at least a majority of the votes entitled to be cast for the election of directors, trustees, managers or other officials having powers analogous to those of directors of a corporation. Unless otherwise specifically indicated, when used herein, the term Subsidiary shall refer to a direct or indirect Subsidiary of the Company.

"Target Capital Account" means, with respect to any Member as of any determination date, an amount equal to the amount such Member would receive as a distribution if all of the assets of the Company were sold on such determination date for cash equal to their Gross Asset Values, all liabilities of the Company were satisfied to the extent required by their terms and the net proceeds were distributed pursuant to Section 8.1; provided, however, that for these purposes

4763/67549-002 Current/9824156v4
4763/67549-002 Current/9899580v1

each Member's interest in the Company shall be calculated by treating all Membership Interests if they were "substantially vested" within the meaning of Treasury Regulation Section 1.83-3(b).

"Transfer" means to transfer, sell, assign, pledge, hypothecate, give, grant or create a security interest in or Lien on, place in trust (voting or otherwise), assign an interest in or in any other way encumber or dispose of, directly or indirectly and whether or not by operation of law or for value, any Membership Interest.

"Treasury Regulations" means all proposed, temporary and final regulations promulgated under the Code, as such regulations may be amended from time to time.

Section 1.2    **Additional Definitions.** The following terms shall have the meanings set forth in the Sections of this Agreement set forth below:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Board of Directors | 4.1(a) |
| Capital Call | 3.3 |
| Capital Call Notice | 3.3 |
| Cure Period | 3.3 |
| Default Notice | 3.3 |
| Certificate of Formation | Recitals |
| Company | Preamble |
| Covered Persons | 12.4 |
| Fiscal Year | 2.6 |
| For Cause Member | 13.12 |
| Initial Members | Preamble |
| Member Default | 3.3 |
| Minimum Gain | 9.3(b)(ii) |
| Minimum Gain Chargeback | 9.3(b)(ii) |
| New Tax Guidance | 13.3(c) |
| Proskauer | 13.5 |
| Qualified Income Offset | 9.3(a) |
| Regulatory Provisions | 9.4 |
| Schedule of Members | 3.1 |
| Tax Matters Partner | 7.7 |
| Withheld Tax Distribution | 8.3(c) |

**ARTICLE II**
**FORMATION; PURPOSE**

Section 2.1    <u>Formation of Limited Liability Company.</u>

(a)    The Company was organized under the laws of the State of Delaware by the filing of the Certificate of Formation. Eric Friedlander is hereby designated as an "authorized person" within the meaning of the Act and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of the State of Delaware.

7

(b)    This Agreement is subject to, and governed by, the Delaware Act and the Certificate of Formation.    In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Delaware Act or the provisions of the Certificate of Formation, such provisions of the Delaware Act or the Certificate of Formation, as the case may be, will be controlling to the extent required thereby.    To the extent any provision of this Agreement is prohibited or ineffective under the Delaware Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Delaware Act.    In the event the Delaware Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid thereafter valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

Section 2.2    **Purpose.**  The purpose of the Company shall be to sponsor the Fund.  The Company may also engage in any other business or activity determined by the Board of Directors that may lawfully be conducted by a limited liability company organized pursuant to the Delaware Act.

Section 2.3    **Term.**  The term of the Company commenced on the date of filing of the Certificate of Formation in the office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved in accordance with the provisions of this Agreement, subject to the requirements of the Delaware Act.

Section 2.4    **Registered Agent and Office.**  The address of the Company's registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, in the city of Wilmington, County of New Castle.  The name of the Company's registered agent at such address is Corporation Service Company.  At any time, the Company may designate another registered agent and/or registered office.

Section 2.5    **Principal Place of Business.**  The principal place of business of the Company shall be at 1 North Clematis St., Suite 130, West Palm Beach, FL 33401.  At any time, the Company may change the location of its principal place of business.

Section 2.6    **Fiscal Year.**  Unless otherwise determined by the Board of Directors, the fiscal year of the Company (the "Fiscal Year") shall end on the last day of each calendar year.

### ARTICLE III
### MEMBERS; CAPITAL CONTRIBUTIONS
### AND LOANS BY MEMBERS

Section 3.1    **Names, Addresses and Capital Commitments of Members.**  The names and mailing addresses of each of the Members, their respective initial Capital Contributions, their respective Capital Commitments (expressed in U.S. dollars), and their respective Percentage Interests are set forth on Schedule A hereto (the "Schedule of Members").  To the extent that any adjustment of Schedule A is required pursuant to this Agreement, whether as a result of the Transfer of any Membership Interest (or any portion thereof), the admission of any additional Member, or otherwise as provided herein, the parties hereto acknowledge and agree that Schedule A shall automatically be deemed amended and restated to reflect the correct name

8

and Percentage Interest of each Member in accordance with the books and records of the Company without further action by any of the parties hereto.

Section 3.2    **Initial Capital Contributions**.  On the date hereof, each Member will make an initial Capital Contribution to the Company in the amount of twenty five percent (25%) of its Capital Commitment.

Section 3.3    **Capital Calls**.  At any time the aggregate Capital Accounts of the Members fall below $25,000, the Board of Directors (or any Director) shall, by delivery of written notice (a "Capital Call Notice") to the Members in accordance with Section 13.6, call for additional Capital Contributions from each Member in the amount of twenty five percent (25%) of such Member's Capital Commitment (a "Capital Call"); provided, however, in no event shall more than three (3) Capital Calls be made.  The Members shall have twenty (20) calendar days from the date of delivery of the Capital Call Notice to fund the Capital Call.  If any Member fails to fund its Capital Call obligation in full within such twenty (20) calendar day period, then the Board of Directors (or any Director) shall deliver notice of such failure to such Member in accordance with Section 13.6 (a "Default Notice").  A Member may cure such failure by funding its Capital Call obligation within twenty (20) calendar days after the date of delivery of the Default Notice (the "Cure Period").  Failure of a Member to fund such Member's Capital Call obligation prior to the expiration of the Cure Period (a "Member Default") shall constitute a For Cause Event with respect to such Member.  Notwithstanding the provisions of this Section 3.3, no Member shall be required to make aggregate Capital Contributions to the Company in excess of the aggregate amount of such Member's Capital Commitment.  If a Member Default occurs, then in addition to the other remedies available to the Company, the Company shall have the right to enforce at law the payment of the amount required to be contributed to the Company that gave rise to such Member Default.

Section 3.4    **Additional Capital Contributions**.  Other than as set forth in Section 3.3, no Member is required to make additional Capital Contributions to the Company. Notwithstanding the previous sentence, after the aggregate Capital Commitments of the Members have been fully funded or if there exists a Member Default, a Member may make such additional Capital Contributions to the Company as are requested or otherwise approved by the Board of Directors, in which event each Member's Percentage Interest will be adjusted so that it equals the percentage determined by dividing the Adjusted Capital Account of such Member (as of the date of such Capital Contribution) by the sum of the Adjusted Capital Accounts of all of the Members (as of the date of such Capital Contribution).

Section 3.5    **Withdrawal.**  No Member shall have the right to withdraw any of such Member's Capital Contributions or to demand and receive property of the Company or any distribution in return for any of such Member's Capital Contributions, except as may be specifically provided in this Agreement or required by law (excluding any law which grants such a right in the absence of a negating provision in this Agreement).  No Member shall receive out of the Company property any part of the Member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them, unless the return of the Capital Contribution may be rightfully demanded as provided in this Agreement or the Delaware Act.

9

Section 3.6    **Loans by Members.**  From time to time, a Member may, with the approval of the Board of Directors, make a loan to the Company.  Unless otherwise determined by the Board of Directors, any loan made by a Member to the Company (x) shall not be considered an additional contribution to the capital of the Company and (y) shall be limited in recourse to the assets of the Company.  No Member shall be required to loan any funds to the Company.

Section 3.7    **Limitation on Liability; Activities.**  No Member shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law or as specifically provided otherwise herein.

Section 3.8    **Partition.**  Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property.

Section 3.9    **Capital Accounts.**

(a)    The Company shall maintain for each Member a separate Capital Account in accordance with the rules of Treasury Regulations Section 1.704-1(b).  Such Capital Account shall be increased by (i) such Member's cash contributions, (ii) the initial Gross Asset Value of property contributed by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to Code Section 752), and (iii) all items of income and gain (including income and gain exempt from tax) allocated to such Member pursuant to this Agreement and decreased by (iv) the amount of cash distributed to such Member, (v) the Gross Asset Value of all actual and deemed distributions of property made to such Member pursuant to this Agreement (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to Code Section 752), and (vi) all items of deduction and loss allocated to such Member pursuant to this Agreement.

(b)    In the event the Gross Asset Value of the Company's assets is adjusted, the Capital Accounts of the Members shall be adjusted to reflect the aggregate net adjustment as if the Company recognized Net Profits and Net Losses equal to the amount of such aggregate net adjustment and such Net Profits and Net Losses were allocated to the Members pursuant to Article IX.

(c)    In the event any Member transfers any Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.  In the event that any Member transfers any Membership Interest back to the Company, then the excess, if any, of (i) the Capital Account of the transferor that relates to the transferred Membership Interest over (ii) the amount paid by the Company for the transferred interest, shall be allocated to the remaining Members in accordance with Section 9.1.

(d)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations and any amendment or successor provision thereto.

10

Section 3.10  **Carried Interest Payments.**  In the event a Member is the subject of a For Cause Event, such Member, its Key Person and/or its Affiliates (as applicable) shall (x) be vested in any "carried interest" that is attributable to investments previously made by the Fund and (y) not be entitled to any "carried interest" on investments made by the Fund after the date of the For Cause Event. Notwithstanding the foregoing, if a Member becomes the subject of a For Cause Event, such Member, its Key Person and/or its Affiliates (as applicable) shall continue to be obligated to satisfy its share of any "clawback" obligations to the Fund.  The definitive documents granting any "carried interest" in the Fund to any Member, a Key Person or its Affiliates shall be drafted in a manner consistent with this Section 3.10.

Section 3.11  **Death or Disability.**  In the event a Member is the subject of a For Cause Event resulting from such Member's Key Person's death or Disability, the Key Person of such Member or such Key Person's estate (as the case may be) shall receive the following salary and benefits (to the extent such Key Person was receiving such salary and benefits from the Company or a Subsidiary at the time of his death or Disability):

(a)    such Employee Benefits, if any, as to which such Key Person may be entitled under the employee benefit plans of the Company or any applicable Subsidiary;

(b)    in the event of a Key Person's death, the base salary otherwise payable to such Key Person shall continue to be paid in accordance with the Company's or the applicable Subsidiary's normal payroll practices for a period of six (6) months;

(c)    in the event of a Key Person's Disability, if the Company or the applicable Subsidiary shall not have obtained for the benefit of such Key Person a customary and appropriate long term disability insurance policy providing annual benefits (when combined with all other long term disability benefit policies of such Key Person) of no less than sixty percent (60%) of his annual base salary, the base salary otherwise payable to such Key Person shall continue to be paid in accordance with the Company's or the applicable Subsidiary's normal payroll practices for a period of six (6) months; or

(d)    to the extent permitted under the Company's or the applicable Subsidiary's group health plan (i) such Key Person (or his spouse and eligible children) shall be permitted to continue participation in the group health plans of the Company or the applicable Subsidiary (at no after tax cost) on the same basis as participation in such plans is made available to active executive employees for a period of one (1) year (the "Continuation Period") and (ii) following the Continuation Period, such Key Person (or his spouse and eligible children) shall have the right to continue to participate in any group health plan of the Company or any applicable Subsidiary (provided that such Key Person (or his estate) pays all applicable costs) on the same basis as participation in such plans is made available to active executive employees for the maximum length of time permitted by the applicable plan.

Section 3.12  **Duties.**  Each Member acknowledges and agrees that, in the event such Member is subject to a For Cause Event (any such Member being hereinafter referred to as a "For Cause Member"), the Board of Directors, in exercising the authority granted to it in this Agreement, to the fullest extent permitted by law, shall have no duty, obligation or liability (fiduciary or otherwise) to such For Cause Member, its Key Person and/or its Affiliates, it being

11

understood that each Director shall be entitled to exercise such authority in any manner it deems necessary or desirable to fulfill any of such Director's objectives (or the objectives of the Member appointing such Director) under this Agreement. Each Member, effective upon such Member's becoming a For Cause Member, hereby (i) absolutely, unconditionally and irrevocably releases, waives, relinquishes, renounces and discharges forever each Director and its Affiliates from any and all claims, covenants, contracts, agreements, promises, judgments, demands, actions or manner of actions, resulting or arising as a result of such Director's exercise of the rights granted to it under this Agreement; and (ii) to the fullest extent permitted by law, agrees to indemnify each Director and its Affiliates and hold each Director and its Affiliates harmless from and against any and all costs, expenses and other liabilities of any kind incurred by such Director or its Affiliates as a result of any claim, action or proceeding brought by or on behalf of such For Cause Member, any direct or indirect investor in such For Cause Member, or any other Person, predicated on the existence of or otherwise relating to any of the rights waived or released in this Section 3.12.

## ARTICLE IV
## MANAGEMENT AND CONTROL OF THE COMPANY

Section 4.1    **Management by Directors.**

(a)    The full and entire management of the business and affairs of the Company shall be vested in a Board of Directors which shall have and may exercise all of the powers that may be exercised or performed by the Company (the "Board of Directors"). Except where expressly required by nonwaivable provisions of the Delaware Act, the Board of Directors shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.

(b)    Without limiting the generality of Section 4.1(a), the Board of Directors shall have full power and authority to authorize the Company:

(i)    to acquire property from any Person; the fact that a Member or Director is directly or indirectly affiliated or connected with any such Person shall not prohibit the Company from dealing with that Person;

(ii)    to borrow money for the Company from banks, other lending institutions, any of the Members or Directors, or Affiliates of any of the Members or Directors on such terms as they deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(iii)    to purchase liability and other insurance to protect the Company's property and business;

(iv)    to hold and own any real and/or personal properties in the name of the Company;

12

(v)    to invest any of the Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(vi)    to execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements; and any other instruments or documents necessary, in the opinion of the Directors, to the business of the Company;

(vii)    to employ accountants, legal counsel, managing agents or other experts to perform services for the Company, and to define their duties and authority, which may include authority granted to the Members or Directors under the Delaware Act, and to compensate them from the Company funds;

(viii)    to retain and compensate employees and agents generally, and to define their duties and authority, which may include authority granted to the Members or Directors under the Delaware Act;

(ix)    to negotiate and enter into any and all other agreements on behalf of the Company with any other Person for any purpose;

(x)    to make tax, regulatory and other filings, or rendering periodic reports to governmental or other agencies having jurisdiction over the business or assets of the Company;

(xi)    to settle, defend, prosecute, or otherwise take any actions on behalf of the Company with respect to any lawsuit or other legal action;

(xii)    to admit additional Members in accordance with this Agreement; and

(xiii)    to do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

(c)    No Member, by reason of such Member's status as such, shall have any authority to act for or bind the Company but shall have only the right to vote on or approve the actions herein specified to be voted on or approved by such Member.

Section 4.2    **Number, Tenure and Qualification; Directors.**

(a)    The Board of Directors shall consist of a number of Directors equal to the number of Initial Members which are not subject to a For Cause Event. Each Initial Member shall have the right to appoint one (1) Director; provided, however, if an Initial Member becomes subject to a For Cause Event it shall no longer have the right to designate a Director. The initial Directors of the Company are as set forth on Exhibit B.

13

(b)    A Director shall hold office for the term for which such Director is appointed and thereafter until his or her successor shall have been appointed and qualified, or until the earlier death, resignation or removal of such Director. Directors need not be Members or residents of the State of Delaware.

(c)    Subject to the limitations set forth in clauses (a) and (d) of this Section 4.2, each Initial Member shall have the right to remove and designate the replacement of any Director appointed by it.

(d)    Any Director appointed by an Initial Member which is the subject of a For Cause Event shall be immediately removed by such Initial Member or, in the event such Initial Member fails to promptly act to remove such Director, the Board of Directors shall have the right to remove such Director.

Section 4.3    **Quorum and Manner of Acting.** Provided that notice of a meeting has been given to each Director as provided in Section 4.7 below, the attendance of a majority (in number) of the members of the Board of Directors shall constitute a quorum for the transaction of business at any meeting. Action of the Board of Directors shall be authorized by majority vote of the Directors; provided, however, if the action to be taken by the Board of Directors involves a Major Decision, such action shall be authorized by at least 75% of the number of Directors then in office. Each Director shall be entitled to one (1) vote. In the absence of a quorum a majority of the Directors present may adjourn any meeting from time to time until a quorum is present.

Section 4.4    **Place of Meetings.** Meetings of the Board of Directors may be held in or outside of the State of Delaware.

Section 4.5    **Annual and Regular Meetings.** Annual meetings of the Board of Directors for the election of Officers and consideration of other matters shall be held on notice as provided in Section 4.7. Regular meetings of the Board of Directors may be held without notice at such times and places as the Board of Directors determines; provided, however, that the Board of Directors shall hold meetings at least four times per year. If the day fixed for a regular meeting is a legal holiday, the meeting shall be held on the next business day.

Section 4.6    **Special Meetings.** Special meetings of the Board of Directors may be called by the Chief Executive Officer or by any of the Directors.

Section 4.7    **Notice of Meetings; Waiver of Notice.** Notice of the time and place of each meeting of the Board of Directors shall be given to each Director by mailing it to him at his residence or a usual place of business at least five (5) days before the meeting, or by delivering, telephoning, telegraphing it or sending it by e-mail, facsimile or other electronic transmission to him at least two (2) days before the meeting. Notice of a special meeting shall also state the purpose or purposes for which the meeting is called. Notice need not be given to any Director who submits a signed waiver of notice before or after the meeting or who attends the meeting without protesting at the beginning of the meeting the transaction of any business because the meeting was not lawfully called or convened. Notice of any adjourned meeting need not be given, other than by announcement at the meeting at which the adjournment is taken.

14

Section 4.8    **Board Action Without a Meeting.**  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all of the members of the Board of Directors consent in writing or by electronic transmission to the adoption of a resolution authorizing the action. The resolutions, written consents or electronic transmissions of the members of the Board of Directors shall be filed with the minutes of the proceeding of the Board of Directors. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.9    **Participation in Board Meetings by Conference Telephone.**  Any or all members of the Board of Directors may participate in a meeting of the Board of Directors by means of a conference telephone or other communications equipment allowing all Persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at the meeting.

Section 4.10    **Resignation and Removal of Directors.**  Any Director may resign at any time by delivering his resignation in writing or electronic transmission to the Chief Executive Officer or Secretary of the Company, to take effect at the time specified in the resignation; the acceptance of a resignation, unless required by its terms, shall not be necessary to make it effective. Any or all of the Directors may be removed at any time, either with or without cause, pursuant to Section 4.2.

Section 4.11    **Vacancies.**  Any vacancy in the Board of Directors, including one created by an increase in the number of Directors, may be filled for the unexpired term pursuant to Section 4.2.

Section 4.12    **Compensation.**  Directors shall receive such compensation as the Board of Directors determines, together with reimbursement of their reasonable expenses in connection with the performance of their duties. A Director may also be paid for serving the Company, its Affiliates or Subsidiaries in other capacities.

## ARTICLE V
## MEETINGS OF MEMBERS

Section 5.1    **Special Meetings.**  Special meetings of the Members may be called by resolution of the Board of Directors or the Chief Executive Officer and shall be called by the Chief Executive Officer or Secretary upon the written request (stating the purpose or purposes of the meeting) of (a) any Director then in office or (b) any Member. Only business related to the purposes set forth in the notice of the meeting may be transacted at a special meeting.

Section 5.2    **Place and Time of Meetings.**  Meetings of the Members may be held in or outside the State of Delaware at the place and time specified by the Directors or Members requesting the meeting. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication, subject to such guidelines and procedures as the Board of Directors may adopt. Subject to such guidelines and procedures adopted by the Board of Directors, the Members not physically present at the meeting of Members may, by means of remote communication (a) participate in a meeting of Members and (b) be deemed present in person and vote at a meeting

15

of Members whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the Company shall implement reasonable measures to verify that each Person deemed present and permitted to vote at the meeting by means of remote communications is a Member, (ii) the Company shall implement reasonable measures to provide such Members a reasonable opportunity to participate in the meeting and to vote on matters submitted to the Members, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any Member or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Company.

Section 5.3 **Notice of Meetings; Waiver of Notice.** Written notice of each meeting of Members shall be given to each Member entitled to vote at the meeting, except that (a) it shall not be necessary to give notice to any Member who submits a signed waiver of notice before or after the meeting, and (b) no notice of an adjourned meeting need be given except when required under this Agreement. Each notice of a meeting shall be given, personally or by mail, not less than 10 nor more than 60 days before the meeting and shall state the time and place, if any, of the meeting, the means of remote communication, if any, by which Members may be deemed to be present in person and vote at such meeting, and shall state at whose direction or request the meeting is called and the purposes for which it is called. If mailed, notice shall be considered given when mailed to a Member at its address on the Company's records. The attendance of any Member at a meeting, without protesting at the beginning of the meeting that the meeting is not lawfully called or convened, shall constitute a waiver of notice by such Member.

Section 5.4 **Quorum.** At any meeting of Members, the presence in person or by proxy of all of the Members shall constitute a quorum for the transaction of any business. In the absence of a quorum, Members holding a majority of the Percentage Interests of all the Members present or, if no Members are present, any Officer entitled to preside at or to act as secretary of the meeting, may adjourn the meeting until a quorum is present. At any adjourned meeting at which a quorum is present any action may be taken which might have been taken at the meeting as originally called. No notice of an adjourned meeting need be given if the time and place, if any, thereof, and the means of remote communications, if any, by which Members may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which the adjournment is taken except that, if adjournment is for more than 30 days or if, after the adjournment, a new record date is fixed for the meeting, notice of the adjourned meeting shall be given pursuant to Section 5.3.

Section 5.5 **Voting; Proxies.** Company action to be taken by Member vote, other than the appointment of Directors, shall be authorized by the affirmative vote of Members holding a majority of the Percentage Interests of all the Members entitled to vote at such meeting, except as otherwise provided by law or by Section 5.6 hereof. Directors shall be appointed in the manner provided in Section 4.2. Voting need not be by ballot unless requested by a Member at the meeting or ordered by the chairman of the meeting. If authorized by the Board of Directors, the requirement for a written ballot may be satisfied by a ballot submitted by electronic transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the Member or proxy holder. Each Member entitled to vote at any meeting of Members or to express consent to or dissent from action in writing without a meeting may

16

authorize another Person to act for such Member by proxy. Every proxy must be signed by the Member or his attorney-in-fact. No proxy shall be valid after three (3) years from its date unless it provides otherwise.

Section 5.6 **Action by Consent Without a Meeting.** Any action required or permitted to be taken at any meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent in writing (or by electronic transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by such Members), setting forth the action so taken, shall be delivered by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voting. Prompt notice of the taking of any such action shall be given to those Members who did not consent in writing.

## ARTICLE VI
## OFFICERS

Section 6.1 **Executive Officers; Security.** The executive Officers of the Company shall be the Chief Executive Officer, the President, one or more Vice Presidents (including one or more executive Vice Presidents, if the Board of Directors so determines), a Secretary and a Treasurer. Any two or more offices may be held by the same Person.. The initial Officers of the Company are as set forth on Exhibit C.

Section 6.2 **Election; Term of Office.** The executive Officers of the Company shall be elected annually by the Board of Directors, and each such Officer shall hold office until the next annual meeting of the Board of Directors. Each Officer shall hold office until such Officer's successor is elected and qualified or until such Officer's earlier resignation or removal pursuant to Section 6.4.

Section 6.3 **Subordinate Officers.** The Board of Directors may appoint subordinate Officers (including assistant secretaries and assistant treasurers), agents or employees, each of whom shall hold office for such period and have such powers and duties as the Board of Directors determines. The Board of Directors may delegate to any executive Officer the power to appoint and define the powers and duties of any subordinate Officers, agents or employees.

Section 6.4 **Removal and Resignation of Officers.** Any Officer may resign at any time by delivering his resignation in writing or other electronic transmission to the Chief Executive Officer or Secretary of the Company, to take effect at the time specified in the resignation; the acceptance of a resignation, unless required by its terms, shall not be necessary to make it effective. Any Officer appointed by the Board of Directors or appointed by an executive Officer may be removed by the Board of Directors either with or without cause, and in the case of an Officer appointed by an executive Officer, by the Officer who appointed him or by the Chief Executive Officer. Notwithstanding the foregoing, an Officer shall not be removed from his or her position in contravention of any employment agreement that is then effective.

Section 6.5 **Vacancies.** A vacancy in any office may be filled for the unexpired term in the manner prescribed in Sections 6.2 and 6.3 for election or appointment to the office.

17

Section 6.6    **Chief Executive Officer.** The Chief Executive Officer shall be the chief executive officer of the Company. Subject to the control of the Board of Directors, the Chief Executive Officer shall have general supervision over the business of the Company and shall have such other powers and duties as chief executive officers and presidents of companies usually have or as the Board of Directors shall assign.

Section 6.7    **President.** The President shall be an executive officer of the Company. Subject to the control of the Board of Directors and supervision of the Chief Executive Officer, the President shall have general supervision over the business of the Company and shall have such other powers and duties as presidents of companies usually have or as the Board of Directors shall assign.

Section 6.8    **Chairman.** The Chairman shall be an executive officer of the Company. Subject to the control of the Board of Directors and supervision of the Chief Executive Officer and the President, the Chairman shall have general supervision over the business of the Company and shall have such other powers and duties as the Board of Directors shall assign. In addition, the Chairman shall serve as the Chairman of any "investment committee" that may be formed by the Board of Directors for purposes of reviewing and recommending potential investment opportunities for the Fund. The Chairman shall also serve as the Chairman of any "investment committee" formed at the level of any of the Company's Subsidiaries or Affiliates.

Section 6.9    **Vice President.** Each Vice President shall have such powers and duties as the Board of Directors or the President assigns.

Section 6.10    **Treasurer.** The Treasurer shall be the chief financial officer of the Company and shall be in charge of the Company's books and accounts. Subject to the control of the Board of Directors, the Treasurer shall have such other powers and duties as the Board of Directors or the Chief Executive Officer assigns.

Section 6.11    **Secretary and Assistant Secretaries.** The Secretary shall be the secretary of, and keep the minutes of, all meetings of the Board of Directors and of the Members, shall be responsible for giving notice of all meetings of Members and of the Board of Directors, and shall keep the seal and, when authorized by the Board of Directors, apply it to any instrument requiring it. Subject to the control of the Board of Directors, the Secretary shall have such powers and duties as the Board of Directors or the Chief Executive Officer assigns. In the absence of the Secretary from any meeting, the minutes shall be kept by the Person appointed for that purpose by the presiding Officer. One or more assistant secretaries may be appointed by the Board of Directors and may be empowered with the same duties as the Secretary.

Section 6.12    **Salaries.** The Board of Directors may fix the Officers' salaries, if any, or it may authorize the Chief Executive Officer to fix the salary of any other Officer. Notwithstanding the foregoing, an Officer's salary shall not be fixed or decreased in contravention of any employment agreement that is then-effective.

Section 6.13    **Voting of Shares in Corporations.** Shares in corporations which are held by the Company may be represented and voted by the Chief Executive Officer, the President or a

18

Vice President of the Company or by proxy or proxies appointed by one of them. The Board of Directors may, however, appoint some other Person to vote the shares.

## ARTICLE VII
## ACCOUNTING AND RECORDS

Section 7.1    **Records and Accounting.** The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, at the expense of the Company in accordance with GAAP. The Board of Directors, after consultation with accountants and/or legal counsel, can adopt a different method of accounting where appropriate. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Members shall maintain and preserve, during the term of the Company, and for five years thereafter, all such books and records.

Section 7.2    **Access to Accounting Records.** All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business and each Member and the Member's duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

Section 7.3    **Tax Returns.** The Company shall deliver to each Member after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return. Each of the Members shall, in its respective income tax return and other statements filed with the Internal Revenue Service or other taxing authority, report taxable income in accordance with the provisions of this Agreement.

Section 7.4    **Accounting Decisions.** All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Directors.

Section 7.5    **Treatment as Partnership.** The Members intend that the Company is to be treated as a partnership for Federal income tax purposes and neither the Company, the Board of Directors nor any Member shall make any election or take any action contrary to such intent.

Section 7.6    **Section 754 Election.** In connection with any assignment or transfer of a Membership Interest described in Code Sections 734(b) and 743(b) which is permitted by the terms of this Agreement, the Board of Directors shall in its reasonable discretion cause the Company, at the written request of the transferor, the transferee or the successor to such Membership Interest, on behalf of the Company and at the time and in the manner provided in Treasury Regulations Section 1.754-1(b) (or any like statute or regulation then in effect) to make an election to adjust the basis of the Company's property in the manner provided in Code Section 755 provided such adjustment increases the basis of the Company's property, and such transferee shall pay all costs incurred by the Company in connection therewith, including, without limitation, reasonable attorneys' and accountants' fees.

Section 7.7    **Tax Matters Partner.** The Board of Directors shall designate one Member as the "Tax Matters Partner" under Code Section 6231(a)(7), with all powers attendant thereto, who shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities,

19

including resulting administrative and judicial proceedings, and to expend the Company's funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Board of Directors and the Tax Matters Partner and to do or refrain from doing any or all things reasonably required by them to conduct such proceedings. M82 shall be the initial Tax Matters Partner. In the event M82 becomes subject to a For Cause Event, M82 shall no longer be the Tax Matters Partner, and the Board of Directors shall designate a new Tax Matters Partner.

Section 7.8    **Other Records.**  The Company shall maintain records at the principal office of the Company or such other place as the Members may determine which shall include the following:

(a)    a current list of the full name and last known business, residence or mailing address of each Member;

(b)    a copy of the Certificate of Formation and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)    copies of the Company's federal, state and local income tax returns and reports, if any, for the four most recent years;

(d)    copies of the Company's currently effective written Agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three most recent Fiscal Years;

(e)    minutes of every annual, special and court ordered meeting of the Members and Board of Directors;

(f)    any written consents obtained from Members for actions taken by Members without a meeting; and

(g)    any written consents obtained from the Board of Directors for actions taken by the Board of Directors without a meeting.

## ARTICLE VIII
## DISTRIBUTIONS

Section 8.1    **General Principles; Amount and Priority.**

(a)    The Board of Directors shall determine the amounts available for distribution and the timing of Distributions, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts deemed necessary for the Company or to place into reserves for customary and usual claims with respect to the Company. The Board of Directors may periodically review any reserves created and may increase such reserves or release any excess amounts in such reserves for distribution in accordance with this Article VIII.

20

(b)      Distributions shall be made only to such Person who, according to the books and records of the Company, is the holder of record of a Membership Interest on the actual date of distribution. Neither the Company nor the Board of Directors shall incur any liability for making Distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Board of Directors have knowledge or notice of any transfer or purported transfer of ownership of any Membership Interest.

(c)      All Distributions shall be distributed to the Members pro rata in accordance with their Percentage Interests.

Section 8.2      **Tax Distributions.**

(a)      Notwithstanding the provisions of <u>Section 8.1</u>, Distributions of Available Cash Flow with respect to each Fiscal Year shall be made to all Members to pay any required income taxes with respect to any cumulative net profits of the Company allocated to the Members, assuming that all Members are subject to a 40% effective tax rate.

(b)      Except as provided in the following sentence, all distributions under this <u>Section 8.2</u> shall be treated as having been made under <u>Section 8.1</u>. To the extent any Distributions under this <u>Section 8.2</u> exceed the amounts distributable to the Members under <u>Section 8.1</u>, any such excess shall be deemed to be an interest free advance to the Members receiving such excess Distributions, payable to the Company from subsequent Distributions as made.

Section 8.3      **Limitation Upon Distributions.**

(a)      No distribution or return of Capital Contribution shall be declared and paid if:

(i)      after such distribution or return is made the Company would be insolvent;

(ii)      after such distribution or return is made the net assets of the Company would be less than zero; or

(iii)      such distribution would violate the Delaware Act or any other applicable law.

(b)      The Board of Directors may base a determination that a Distribution or return of Capital Contribution may be made under <u>Section 8.3(a)</u> in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

(c)      Notwithstanding anything contained herein to the contrary, the Board of Directors may reduce the amount of Available Cash Flow otherwise distributable under <u>Section 8.2</u> by any amount that the Board determines is or may be required for the operations of the Company (a "<u>Withheld Tax Distribution</u>"). Upon a determination by the Board of Directors that

21

any Withheld Tax Distribution need not be retained by the Company, the Board of Directors shall release any such amounts for distribution in accordance with Section 8.2.

## ARTICLE IX
## TAXATION PROVISIONS

Section 9.1    <u>**Allocation of Net Profits and Net Losses of the Company.**</u>

(a)    All Net Profits and Net Losses shall be allocated among the Members so as to reduce, proportionately, the difference between their respective Target Capital Accounts and Adjusted Capital Accounts as of the end of each Fiscal Year.

(b)    If, upon the liquidation of the Company, notwithstanding any other provision of this Agreement, the balance of any Member's Adjusted Capital Account differs from the balance of its Target Capital Account, then the Member with an excess or deficit balance, as the case may be, shall be specially allocated items of income, gain, loss or deduction, for such Fiscal Year, equal to the difference between its Adjusted Capital Account and its Target Capital Account.

Section 9.2    <u>**Residual Allocations.**</u>    Except as otherwise provided in this Agreement, all items of income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Net Profits or Net Losses, as the case may be, for the Fiscal Year. Upon any change in the relative Membership Interests of the Members, whether by reason of the admission or withdrawal of a Member, the Transfer by any Member of all or any part of its Membership Interest, or otherwise, the Members' shares of all items shall be determined by reference to any method acceptable under the Treasury Regulations under Code Section 706, as determined by the Board of Directors.

Section 9.3    <u>**Special Allocations.**</u>

(a)    No Member shall be allocated any item of loss or deduction to the extent said allocation will cause or increase any deficit in said Member's Adjusted Capital Account. If any Member with a deficit in its Adjusted Capital Account unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), then items of income and gain shall be specifically allocated to such Member in an amount and manner sufficient to eliminate the deficit in said Member's Adjusted Capital Account created by such adjustment, allocation or distribution as quickly as possible. The Members intend that the provisions set forth in this clause will constitute a "Qualified Income Offset" as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(b)    The following provisions shall be applicable beginning in the first taxable year in which the Company has "nonrecourse deductions" as defined in Treasury Regulations Section 1.704-2(b)(1):

(i)    All nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) shall be charged to the Members, pro rata based upon their Percentage Interests.

22

(ii)    If in any Fiscal Year of the Company there is a net decrease in Minimum Gain, then each Member with a share of Minimum Gain (as determined in accordance with Treasury Regulations Section 1.704-2(g)(1)) as of the beginning of such year shall be allocated items of income and gain for such year (and, if necessary, for succeeding years), equal to that Member's share of the net decrease in Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(g)(2)). In allocating the income and gain pursuant to the previous sentence, gains recognized from the disposition of assets subject to nonrecourse liabilities of the Company shall be allocated first to the extent of the decrease in Minimum Gain attributable to the disposition of said asset. Thereafter, any income and gain to be allocated shall consist of a pro rata amount of other income and gain for that year. The Members intend that this clause (ii) will constitute a "Minimum Gain Chargeback" as set forth in Treasury Regulations Section 1.704-2(f). For purposes of this Section 9.3(b)(ii), "Minimum Gain" means the total gain which the Company would realize if it sold, in a taxable disposition, each of its assets that were subject to nonrecourse liabilities in full satisfaction of the liabilities. In computing such gain, only the portion of the assets' tax bases allocated to nonrecourse liabilities of the Company shall be taken into account.

(iii)    If any Member bears the "economic risk of loss" (within the meaning of Treasury Regulations Section 1.752-2) with respect to any nonrecourse loan of the Company, then (A) the losses, deductions or Code Section 705(a)(2)(B) expenditures that are attributable to such nonrecourse loan for any fiscal year or other period shall be allocated to the Members who bear the burden of such economic risk of loss in accordance with Treasury Regulations Section 1.704-2(i), and (B) if in any taxable year there is a net decrease in partner nonrecourse debt minimum gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(4)) attributable to such nonrecourse loan, each Member with a share of partner nonrecourse debt minimum gain (as defined in Treasury Regulations Section 1.704-2(i)(2)) attributable to such nonrecourse loan (as determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the year shall be allocated items of income and gain for the year (and, if necessary, for succeeding years), equal to that Member's share of the net decrease in the partner nonrecourse debt minimum gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(4)).

Section 9.4    **Regulatory Provisions.**  The provisions of Section 9.3 (collectively, the "Regulatory Provisions") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all allocations pursuant to the Regulatory Provisions shall be offset either with other allocations pursuant to the Regulatory Provisions or, if necessary, with curative allocations of other items of income, gain, loss or deduction pursuant to this Section 9.4. Therefore, notwithstanding any other provision of this Agreement, other than the Regulatory Provisions, allocations pursuant to the Regulatory Provisions shall be taken into account in allocating other items of income, gain, expense or loss among the Members so that, to the extent possible, the net amount of such allocations of other items and the allocations pursuant to the Regulatory Provisions to each Member are equal to the net amount that would have been allocated to such Member if the Regulatory Provisions were not part of this Agreement. In applying this Section 9.4, there shall be taken into account (a) future allocations under Section 9.3(b)(ii) that, although not yet made, are likely to offset other allocations previously made under Section 9.3(b)(i), and (b) future allocations under Section

23

9.3(b)(iii)(B) that, although not yet made, are likely to offset other allocations previously made under Section 9.3(b)(iii)(A).

Section 9.5    **Section 704(c) Allocation.** Any item of income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company and which is required or permitted to be allocated to such Member for income tax purposes under Code Section 704(c) so as to take into account the variation between the tax basis of such property and its Gross Asset Value at the time of its contribution shall be allocated to such Member solely for income tax purposes in the manner so required or permitted.

If, under Treasury Regulations Section 1.704-1(b)(2)(iv)(f), property of the Company that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a Gross Asset Value that differs from the adjusted tax basis of such property, then Depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its Gross Asset Value in the same manner as variations between the adjusted tax basis and Gross Asset Value of property contributed to the Company are taken into account (as provided in the preceding paragraph) in determining the Members' shares of tax items under Code Section 704(c).

Allocations pursuant to this Section 9.5 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses or other items of distributions pursuant to any provision of this Agreement.

Section 9.6    **Withholding.** If the Board of Directors, in its reasonable judgment, determines that the Code requires the Company to withhold any tax with respect to a Member's distributive share of income, gain, loss, deduction or credit or any Distributions, the Board of Directors shall cause the Company to withhold and pay the tax. If at any time the amount required to be withheld exceeds the amount that would otherwise be distributed to the Member to whom the withholding requirement applies, any such excess shall be deemed to be an interest free advance to the Members receiving such excess Distributions, payable to the Company from subsequent distributions as made. Any amount withheld with respect to a Member shall be treated as though it had been distributed to that Member under Article VIII for all purposes of this Agreement.

Section 9.7    **Distributions in Kind.** If assets of the Company are distributed in kind, Net Profits and Net Losses shall be allocated as if such assets had been sold for their fair market value on the date of distribution. For purposes of this allocation, the fair market value of any such assets shall be determined by the Board of Directors.

## ARTICLE X
## TRANSFERABILITY

Section 10.1    **Restrictions on Transfer.**

(a)    No Member may Transfer, directly or indirectly, all or any portion of its Membership Interest in the Company without the prior written consent of Board of Directors.

24

(b)    No Transfer shall be effective or valid hereunder unless the transferee is at such time a party to this Agreement or has previously executed and delivered to the Company a Joinder Agreement in accordance with Section 10.3.

(c)    Any Transfer made or attempted to be made in violation of this Section 10.1 shall be null and void ab initio.

Section 10.2    **Effectiveness of Transfers.**  Any Membership Interests Transferred by a Member shall be held by the transferee thereof pursuant to this Agreement.  Such transferee shall, except as otherwise expressly stated herein, have all the rights and be subject to all of the obligations of a Member under this Agreement automatically and without requiring any further act by such transferee or by any parties to this Agreement.  Without affecting the preceding sentence, if such transferee is not a Member on the dates of such Transfer, then such transferee, as a condition to such Transfer, shall confirm such transferee's obligations hereunder in accordance with Section 10.3.  No Membership Interests shall be Transferred on the Company's books and records, and no Transfer thereof shall be otherwise effective, unless any such Transfer is made in accordance with the terms and conditions of this Agreement.

Section 10.3    **Joinder.**  Notwithstanding anything to the contrary contained in this Agreement, it shall be a condition to the acquisition of Membership Interests by any Person not already party to this Agreement via a Transfer permitted by this Agreement or via the issuance of new Membership Interests that such Person shall have previously executed and delivered a Joinder Agreement to the Company and thereby have become party to this Agreement.

### ARTICLE XI
### TERMINATION

Section 11.1    **Termination of the Company.**

(a)    The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(i)    the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act;

(ii)    the written consent of the Board of Directors;

(iii)    sale of all or substantially all of the assets of the Company, provided, however, that a sale of substantially all of the assets of the Company the proceeds from which are retained or reinvested by the Company shall be exempted from the coverage of this Section 11.1; or

(iv)    at any time there are no Members of the Company unless the Company is continued without dissolution in accordance with the Delaware Act.

(b)    The withdrawal, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates a Member's continued membership in the Company shall not result in the dissolution of the Company.

25

Section 11.2  **Individual Termination.**  This Agreement shall terminate with respect to any Member at the time at which such Member ceases to own any Membership Interests, except that such termination shall not affect (i) rights perfected or obligations incurred by such Member under this Agreement prior to such termination, and (ii) rights or obligations expressly stated to survive such cessation of ownership of Membership Interests.

Section 11.3  **Distribution of Assets.**

(a)  If the Company is dissolved and its affairs are to be wound up, the Directors shall (i) sell or otherwise liquidate all of the Company's assets as promptly as the Directors determine to be advisable in order to obtain a fair value therefor (except to the extent the Directors may determine to distribute any assets to the Members in kind), (ii) discharge all liabilities of the Company (other than liabilities to Members), including all costs relating to the dissolution, winding up, and liquidation and distribution of assets, (iii) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company, (iv) discharge any liabilities of the Company to the Members (other than on account of their interests in the Company) and (v) distribute the remaining assets to the Members in accordance with Section 8.1.

(b)  Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(c)  The Directors shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.4  **Certificate of Cancellation.**  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been Distributed to the Members, the Company shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware and take such other actions as may be necessary, appropriate or desirable to terminate the Company.

Section 11.5  **Return of Contribution Nonrecourse to Other Members.**  Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of such Member's Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

**ARTICLE XII**
**INDEMNIFICATION AND LIMITED LIABILITY**

Section 12.1  **Indemnification of Officers and Directors.**  Subject to the limitations and conditions as provided in this Article XII, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is

26

the legal representative, is or was a Member, an Affiliate of a Member, a Director or an Officer, in their capacity as such, shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, reasonable attorneys' and experts' fees) incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation (each a "Loss"); provided, however, that such Person shall not be entitled to indemnification under this Section 12.1 for any Loss caused by such Person's willful misconduct. Indemnification under this Section 12.1 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Section 12.1 shall be deemed contract rights, and no amendment, modification or repeal of this Section 12.1 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal.

Section 12.2    **Indemnification of Employees.**  The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company, each to the same extent as if such individual was an Officer or Director.

Section 12.3    **Advance Payment.**  The right to indemnification conferred in this Article XII shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 12.1 or for whom the Company has agreed to provide indemnification under Section 12.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct necessary for indemnification hereunder and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified hereunder.

Section 12.4    **Limited Liability.**

(a)    No Member, Affiliate of a Member, Director or Officer (collectively, the "Covered Persons") shall be liable to the Company or any other Person who is a party to or is otherwise bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person, except that a Covered Person shall be liable to the Company or any such other Person for any such loss, damage or claim incurred by reason of such Covered Person's willful misconduct.

(b)    Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, Director, Officer or employee shall be obligated personally for any such debt, obligation or liability of the Company solely by

27

reason of being a Member, Director, Officer or employee of the Company. No Member shall, in such capacity, have any power to represent, act for, sign for or bind the Company, and the Members hereby consent to the exercise by the Board of Directors and the Officers of the powers conferred on them by law and this Agreement.

# ARTICLE XIII
## MISCELLANEOUS

Section 13.1    **Representations and Warranties of the Members**.    Each Member represents and warrants to the other Members, as of the date of this Agreement, as follows:

(a)    It is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation with all requisite power and authority to enter into this Agreement and to conduct the business of the Company;

(b)    At least seventy five percent (75%) of each class of equity interests of such Member is owned, directly or indirectly, by such Member's Key Person and/or his immediate family members (or trusts established for the benefit of such immediate family members);

(c)    This Agreement constitutes the legal, valid and binding obligation of the Member enforceable in accordance with its terms;

(d)    No consents or approvals are required from any governmental authority or other person or entity for the Member, other than those whose consent has been secured, to enter into this Agreement or to take any action or grant any consent or approval under this Agreement. All limited liability company action on the part of the Member necessary for the authorization, execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, has been duly taken;

(e)    The execution and delivery of this Agreement by such Member, and the consummation of the transactions contemplated hereby, do not conflict with or contravene the provisions of such Member's organizational documents or any agreement or instrument by which it or its properties are bound or any law, rule, regulation, order or decree to which it or its properties are subject; and

(f)    No Member has retained any broker, finder or other commission or fee agent, and no such person has acted on its behalf in connection with the acquisition of the Membership Interest being acquired by it or the execution and delivery of this Agreement.

Section 13.2    **Remedies**.    The parties to this Agreement acknowledge and agree that the covenants of the Company and the Members set forth in this Agreement may be enforced in equity by a decree requiring specific performance. Without limiting the foregoing, if any dispute arises concerning the sale or other disposition of any of the securities of the Company subject to this Agreement or concerning any other provisions hereof or the obligations of the parties hereunder, the parties to this Agreement agree that an injunction may be issued in connection therewith. Such remedies shall be cumulative and non-exclusive and shall be in addition to any other rights and remedies the parties may have under this Agreement or otherwise.

28

Section 13.3   **Entire Agreement; Amendment.**

(a)     This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter hereof. This Agreement and the Certificate of Formation replace and supersede all prior written agreements and oral statements by and among the Members or any of them, and no representation, statement, condition or warranty not contained in this Agreement or the Certificate of Formation will be binding on the Members or have any force or effect whatsoever.

(b)     The Schedule of Members may be updated in writing by the Company to reflect changes in the composition of the Members and changes in their addresses or facsimile numbers that may occur from time to time as a result of Transfers permitted under Article X. Amendments of the Schedule of Members reflecting Transfers permitted under Article X shall become effective when the amended Schedule of Members, and a copy of the Joinder Agreement as executed by any new transferee in accordance with Section 10.3, if applicable, are filed with the Company. Any amendment of the Schedule of Members made in accordance with this Agreement shall not be deemed an amendment to this Agreement.

(c)     Notwithstanding anything to the contrary contained herein, the Tax Matters Partner is hereby authorized to amend this Agreement, in its sole discretion, to ensure that this Agreement complies with (i) any rulings, regulations, notices, announcements or other guidance regarding compensatory partnership interests issued after the date hereof ("New Tax Guidance") and (ii) any elections that the Tax Matters Partner determines to be necessary or advisable in respect of any such New Tax Guidance. Any such amendment may include, without limitation, (A) a provision authorizing the Tax Matters Partner in its sole discretion to make any election under the New Tax Guidance, (B) a provision whereby the Company and the Members agree to comply with the requirements of the New Tax Guidance and any election made by the Tax Matters Partner with respect thereto, and (C) an amendment to the allocation provision of this Agreement for the purpose of complying with the New Tax Guidance and any election made by the Tax Matters Partner with respect thereto, including without limitation, a provision requiring "forfeiture allocations" as appropriate. Any such amendments to this Agreement shall be binding upon all Members.

(d)     Any amendment to the definition of "For Cause Event", or to Section 3.10, Section 3.11 or this Section 13.3(d) shall require the unanimous written consent of the Members, and any amendment to the Capital Commitment amounts set forth on Schedule A hereto, with respect to any Member, shall require the written consent of such Member.

(e)     Any other amendment to this Agreement shall be in writing and shall require the written consent of the Board of Directors.

Section 13.4   **Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

29

Section 13.5   **Legal Representation.**   Proskauer Rose LLP ("Proskauer") has been engaged to act as legal counsel to the Company. Proskauer has not been engaged to protect or represent the interests of any Member with regard to the Company or this Agreement, and no other legal counsel has been engaged by the Company to act in such capacity. In its capacity as legal counsel to the Company, Proskauer may be subject to actual or potential conflicts arising from, among other things, its representation of one or more Members in connection with matters other than the preparation of this Agreement or the operations of the Company. Each Member hereby (i) approves Proskauer's representation of the Company, (ii) acknowledges that actual or potential conflicts of interest exist among the Members, that no Member's interests will be represented by legal counsel unless such Member engages counsel on its own behalf, and that each such Member has been afforded the opportunity to engage and seek the advice of its own legal counsel before entering into this Agreement, and (iii) acknowledges that neither this Agreement nor the transactions contemplated hereby are intended to create an attorney/client relationship between Proskauer, on the one hand, and any Member, on the other hand, or any other relationship pursuant to which any such Member would have a right to object to Proskauer's representation of any Person under any circumstances; provided, however, that Proskauer shall not represent any individual Member in connection with any dispute arising from or relating to this Agreement without the prior consent of each other Member, but Proskauer shall be free to represent the Company in connection with any such dispute.

Section 13.6   **Notices.**   All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. New York time on a business day, and otherwise on the next business day, or (c) one (1) business day, after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the address for such recipient set forth on the Schedule A, or in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. In addition to the procedures above, any notice to the Board of Directors or the Company shall be deemed given if received by the Board of Directors at the principal office of the Company designated pursuant to Section 2.5.

Section 13.7   **Binding Effect; Assignment.**   This Agreement shall be binding upon and inure to the benefit of the parties hereto and to their respective transferees, successors, assigns, heirs and administrators, provided that the rights under this Agreement may not be assigned except as expressly provided herein. No such assignment shall relieve an assignor of its obligations hereunder.

Section 13.8   **Recapitalizations, Exchanges, etc.**   The provisions of this Agreement shall apply, to the full extent set forth herein with respect to Membership Interests, to any and all equity interests in the Company or any successor or assign of the Company (whether by conversion, merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or in substitution of Membership Interests, by reason of a distribution, combination, recapitalization, reclassification, conversion, merger, consolidation or otherwise. Upon the occurrence of any such events, amounts hereunder shall be appropriately adjusted.

30

Section 13.9  **Action Necessary to Effectuate the Agreement.**  The parties hereto agree to take or cause to be taken all such corporate and other action as may be necessary to effect the intent and purposes of this Agreement.

Section 13.10 **Purchase for Investment.**  Each Member acknowledges that all of the securities of the Company held by such Member are being (or have been) acquired for investment and not with a view to the distribution thereof and that no Transfer, hypothecation or assignment of any such securities may be made except in compliance with applicable federal and state securities laws.

Section 13.11 **Title to Property.**  Legal title to all property of the Company will, unless otherwise consented to by all Members, be held and conveyed in the name of the Company.

Section 13.12 **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

Section 13.13 **Reliance on Authority of Persons Signing Agreement.**  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

Section 13.14 **No Waiver.**  No course of dealing and no delay on the part of any party hereto in exercising any right, power or remedy conferred by this Agreement shall operate as waiver thereof or otherwise prejudice such party's rights, powers and remedies.  No single or partial exercise of any rights, powers or remedies conferred by this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 13.15 **Counterparts.**  This Agreement may be executed in two or more counterparts (including Joinder Agreements as counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and all signatures need not appear on any one counterpart. Any counterpart or other signature hereupon delivered by facsimile or pdf (portable data format) shall be deemed for all purposes as constituting good and valid execution and delivery of this Agreement by such party. The failure of any Member to execute this Agreement does not make it invalid as against any other Member.

Section 13.16 **Headings, etc.**  All headings and captions in this Agreement are for purposes of references only and shall not be construed to limit or affect the substance of this Agreement. Words used in this Agreement, regardless of the gender and number used, will be deemed and construed to include any other gender, masculine, feminine, or neuter, and any other number, singular or plural, as the context requires.  As used in this Agreement, the word "including" is not limiting, and the word "or" is not exclusive.  The words "this Agreement," "hereto," "herein," "hereunder," "hereof," and words or phrases of similar import refer to this Agreement as a whole, together with any and all Schedules and Exhibits hereto, and not to any particular article, section, subsection, paragraph, clause or other portion of this Agreement.

31

Section 13.17 **Governing Law; Jurisdiction; Service of Process.** This Agreement shall be governed by the laws of the State of Delaware, without regard to any conflicts of laws principles thereof that would call for the application of the laws of any other jurisdiction. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against either of the parties in the courts or the State of Delaware, of if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world, whether within or without the State of Delaware.

Section 13.18 **Confidentiality; Public Announcements.** No Member shall disclose or use in any manner whatsoever, in whole or in part, any information concerning the Company or any of its direct or indirect Members, or any of their respective employees, directors or Subsidiaries or Affiliates, received on a confidential basis from the Company or any other Person under or pursuant to this Agreement or any other agreement with the Company, including, without limitation, financial terms and financial and organizational information contained in any documents, statements, certificates, materials or information furnished, or to be furnished, by or on behalf of the Company or any other Person in connection with the purchase or ownership of any Membership Interest; provided, however, that the foregoing shall not be construed, now or in the future, to apply to any information reflected in any recorded document, information which is independently developed by such Member, information obtained from sources other than the Company or any of its direct or indirect Members, or any of their respective employees, directors, Subsidiaries or Affiliates or any of their respective agents or representatives (including, without limitation, attorneys, accountants, financial advisors, engineers and insurance brokers) or information that is or becomes in the public domain, nor shall it be construed to prevent such Member from (i) making any disclosure of any information (A) if required to do so by any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any court or other governmental authority, in each case applicable to or binding upon such Member, (B) to any governmental authority having or claiming authority to regulate or oversee any aspect of such Member's business or that of the parent entity or Affiliates of such Member in connection with the exercise of such authority or claimed authority, or (C) pursuant to subpoena; (ii) making, on a confidential basis, such disclosures as such Member deems necessary or appropriate to such Member 's legal counsel, accountants (including outside auditors) or general or managing partner or member; (iii) making such disclosures as such Member reasonably deems necessary or appropriate to any transferee and/or counsel to or other representatives of such bank or financial institution or other entity, to which such Member in good faith desires to Transfer all or a portion of its interest in any Membership Interest; provided, however, that such transferee or counsel to or representative thereof, agree to maintain the confidentiality of such disclosures on the terms stated herein; or (iv) making, on a confidential basis, disclosures of such information to current Members.

*[signatures on following page]*

32

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth above.

**CRIMSON CAPITAL LLC**

By: _____

Name: MICHAEL STAISIL

Title: MANAGER

**STEPHEN NORRIS CAPITAL PARTNERS LLC**

By: _____

Name:

Title:

**M82 GROUP LLC**

By: _____

Name: MARSHALL MANLOV

Title: PRESIDENT

**DDD VENTURES LLC**

By: _____

Name:

Title:

## SCHEDULE A

### SCHEDULE OF MEMBERS

| MEMBER | INITIAL CAPITAL CONTRIBUTION | CAPITAL COMMITTMENT | PERCENTAGE INTEREST |
|---|---|---|---|
| CRIMSON CAPITAL LLC<br>P.O. Box 72196<br>Las Vegas, Nevada<br>89170 | $12,500 | $50,000 | 25% |
| STEPHEN NORRIS CAPITAL PARTNERS LLC<br>1 North Clematis St., Suite 130, West Palm Beach, FL 33401 | $12,500 | $50,000 | 25% |
| M82 GROUP LLC<br>2475 Marseilles Dr. Palm Beach Gardens, Fl. 33410 | $12,500 | $50,000 | 25% |
| DDD VENTURES LLC<br>2954 Hurlingham Drive Wellinton, FL 33414 | $12,500 | $50,000 | 25% |
| **TOTAL:** | **$50,000** | **$200,000** | **100%** |

## EXHIBIT A

## JOINDER AGREEMENT

The undersigned (the "Joining Party") is executing and delivering this Joinder Agreement pursuant to the Limited Liability Company Agreement of the THE SPARTAN HOLDING COMPANY LLC, a Delaware limited liability company, by and among the members thereof, dated as of _____, as the same may be amended from time to time (the "LLC Agreement").

By executing and delivering this Joinder Agreement to the LLC Agreement, the Joining Party hereby ratifies and agrees to become a party to, be bound by, and comply with the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to such agreement. In connection therewith, effective as of the date hereof the Joining Party hereby makes the representations and warranties contained in the LLC Agreement.

Accordingly, the Joining Party has executed and delivered this Joinder Agreement as of the __ day of _____, 2___.

[NAME OF JOINING PARTY]

By: _____
    Name:
    Title:

    Address for Notices:

## EXHIBIT B

## DIRECTORS

Stephen Norris

Marshall Manley

Dennis Dammerman

Michael Staisil

## EXHIBIT C

## OFFICERS

Stephen Norris – Co-CEO and Co-President

Marshall Manley -- Co-CEO and Co-President

Dennis Dammerman -- Chairman

Michael Staisil – Secretary and Treasurer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CRIMSON CAPITAL LLC and MICHAEL
STAISIL,                                    :

                                            :        08 Civ. 6554 (JFK)

                                            :

                            Plaintiff,      :

            v.                              :        **AFFIDAVIT OF SERVICE**

                                            :

THE SPARTAN GROUP HOLDING                   :
COMPANY, LLC, SPARTAN INVESTMENT            :
PARTNERS LP, SPARTAN INVESTMENT             :
ASSOCIATES LP, SPARTAN PARTNERS GP,         :
LLC, SPARTAN CAPITAL MANAGEMENT,            :
LLC, STEPHEN NORRIS CAPITAL                 :
PARTNERS LLC, STEPHEN NORRIS, M82           :
GROUP LLC, MARSHALL MANLEY, DDD             :
VENTURES LLC, DENNIS DAMMERMAN,             :
GE ASSET MANAGEMENT INCORPORATED,           :
INFLEXION CAPITAL PARTNERS, LP, ABC         :
LLC, DEF LLC, UVW LP, and XYZ LP,           :

                                            :

                            Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


Regine Hallissey, being duly sworn, deposes and says:

   1.      That deponent is not a party to the action, is over 18 years of age and resides in county New York, New York.

   2.      On the 25th day of July, 2008, deponent served the within Answer and Counterclaims upon:

            **ALTMAN & COMPANY PC**
            260 Madison Avenue, 22nd Floor
            New York, New York 10016

            **STEPHEN NORRIS CAPITAL
            PARTNERS LLC**
            1 North Clematis St., Suite 130
            West Palm Beach, FL 33401

            **STEPHEN NORRIS**
            1701 S. Flagler Drive, #1801
            West Palm Beach, FL 33401

**GE ASSET MANAGEMENT INC.**
3001 Summer Street
Stamford, CT, 06905-4317

at the above address, via First Class Mail, by depositing a true copy of same enclosed in a postpaid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Post Office Department within New York State.

_Regine Hallissey_

Sworn to before me this
25th day of July, 2008

_Notary Public_

JEAN KELLER
Notary Public, State of New York
No. 01KE4771140
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Oct. 31, 20 10

2